**SNA, INC. and Silva Enterprises Limited, Plaintiffs,**

v.

**Paul ARRAY and Horizon Unlimited, Defendants.**

**Richard F. Silva and SNA, Inc., Plaintiffs,**

v.

**Douglas Karlsen, a/k/a Douglas Jaworski t/a Turbine Design, Inc., Defendant.**

**Civil Action Nos. 97–7158, 97–3793.**

United States District Court,
E.D. Pennsylvania.

June 9, 1999.

Terry Elizabeth Silva, Philadelphia, PA, for Plaintiffs.

Martin A. Pedata, Palm Harbor, FL, Tracey Oandasan, Woodstown, NJ, Richard F. Klineburger, III, Philadelphia, PA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

The plaintiffs in these two consolidated cases are Richard Silva and two companies he operates, SNA, Inc. and Silva Enterprises, Ltd (SEL). Through these companies, Silva manufactures do-it-yourself kits for an amphibious aircraft called the Seawind. The customer is responsible for building the plane—FAA regulations require the customer to do 51% of the work, so that the aircraft qualifies as experimental and is thus exempt from certain other FAA safety regulations for standard aircraft. The customer must also purchase and add several necessary parts of the plane that are not sold in the kit, notably an engine. The cost of the Seawind kit is between $40,000 and $50,000. To build a plane to completion costs, at a minimum, approximately $70,000. A finished plane sells for $200,000 to $375,000.

The defendants are Douglas Karlsen and a company he operates called Turbine Design, Inc., and Paul Array and a company he operates called Horizon Unlimited. Karlsen and Turbine Design sell turbine engines which they install in Seawinds, and they have assembled Seawinds for kit purchasers. Array and Horizon Unlimited own a Seawind and publish a newsletter called "The Seawind Builders Newsletter." Each of the defendants operates a website, both of which currently or in the past have discussed plaintiffs.

In these lawsuits, plaintiffs contends that the defendants have breached contracts with SNA, have defamed Silva and his company and disparaged their goods, have infringed on their trademark and trade dress rights, have engaged in unfair competition, have interfered with the company's contractual relations and prospective business relations, and have engaged in a civil conspiracy. Defendants Karlsen and Turbine Design have counterclaimed, alleging antitrust violations and seeking to invalidate Silva's patent and trademark.

The court previously ruled on plaintiffs' motion for a preliminary injunction, and those findings and conclusions are incorporated in this opinion. Following a consolidated bench trial of these two cases, the court makes the following findings of fact and conclusions of law.[1]

### Breach of Contract

Plaintiffs claim that defendants breached contracts with SNA by making molds of Seawind parts. Defendants admit to making molds but argue that it was not violative of their contracts to do so.

■ Array purchased a Seawind from SNA in 1991. A purchase agreement between SNA and Horizon Unlimited was signed by both parties on November 30, 1991. Paul Array signed the contract on behalf of Horizon Unlimited.[2] The agree-

---

1. This court has jurisdiction over the unfair competition claims pursuant to 28 U.S.C. § 1338(a), and pendent jurisdiction over the state claims pursuant to 28 U.S.C. § 1338(b), as well as pursuant to a forum selection clause in the contracts between the parties. Venue in this district is proper by virtue of the forum selection clause.

2. The parties disagree about whether Array is individually liable on this contract. Because of the resolution of the claim, it is not necessary to decide the question.

ment included the following language: "Purchaser will not (a) sell or duplicate or permit others to duplicate any Aircraft parts supplied by S.N.A., Inc. in the Kit." *See* Ex. D–5 at 3. On November 19, 1993, Horizon Unlimited and SNA entered into a "Demonstrator Cooperation Agreement," which created an arrangement in which Horizon Unlimited would "provide demonstration flights for potential Purchasers to encourage prospective purchasers to buy and assemble a Seawind aircraft" in return for the payment of a commission from sales resulting from demonstrations. The agreement provided that Horizon Unlimited had "a fiduciary responsibility not to duplicate or copy, or permit others to duplicate or copy any or all of the Seawind aircraft, part of the aircraft, accessories, options, drawings, instructions, printed matter or the like which shall all be designated as proper proprietary information." *See* Ex. P–16. Array signed this agreement on behalf of Horizon Unlimited. The contract was later terminated, but it contained a provision that the non-copying prohibition remained in effect even after termination.

On January 27, 1995 and February 1, 1995, Karlsen signed two contracts. These were contracts that Karlsen entered into as the builder of two Seawinds, one belonging to John Hare and one belonging to Bernie Little (referred to as the Elliot plane). Each contract consisted of a copy of the page of SNA's standard purchase agreement that contains the provision prohibiting the copying of parts:

> Any duplication or copying of parts, whether or not made from molds, or the making of molds from parts is in viola-

tion of this Agreement, and the Purchaser is liable for damages. The Purchaser expressly agrees not to copy or duplicate any parts or to permit others to copy or duplicate parts. The Purchaser agrees to purchase all parts for the basic kit as enumerated in the Agreement, from S.N.A., Inc., and only S.N.A., Inc. The Purchaser acknowledges that he is allowed to make parts or accessories for the aircraft not available from S.N.A., Inc., solely for his own use and not for others, whether for sale or otherwise.

Ex. P–10 (both contracts).[3]

Karlsen contends that by signing those two contracts, he agreed only to refrain from making molds of the two particular planes in conjunction with which the contracts were presented to him. The court is satisfied that the parol evidence submitted on this point, in the form of Silva's and Skip Stundis's testimony, proves that SNA's intention was to prohibit copying parts from any Seawind kit and that Karlsen understood and acquiesced in that intention.

All the defendants admit that molds have been made from Jimmy Hatfield's Seawind, which was at Turbine Design's shop because Turbine Design was building it for Hatfield. In the spring of 1997, Turbine Design hired Brent Whitehouse and his company Piranha Boats, Inc. (a fiberglass shop near Turbine Design's location) to make a mold of the body of the plane, and Piranha Boats did so.[4] Christopher Robertson, a former employee of Turbine Design and friend of Whitehouse, testified that in April or May, he saw a Turbine Design employee making molds of

---

3. Defendants raise several defenses to the enforceability of the contracts: they are contracts of adhesion, they violate antitrust law and federal public policy, and plaintiffs are barred from enforcing them by the unclean hands doctrine. The court rules that none of these arguments are successful, and the contracts are enforceable.

4. Both sides rely on the testimony of Whitehouse to support their conflicting positions.

Whitehouse's testimony is somewhat contradictory about his understanding of what the molds were to be used for, but the most that can be said is that he did not really know. Especially because the court was only given his testimony in deposition form and is thus unable to evaluate well the relative credibility of his various statements, it does not weigh in either side's favor.

a canopy, a hull and tail, and of small detailed parts of the Seawind. That employee (Eugene Koetze) told Robertson that Turbine Design was going to make parts (plural) from the molds. The molds made at Piranha Boats, Inc. are now being held pursuant to a Florida state court temporary restraining order.

During the same time period that defendants arranged to have the molds made, Turbine Design displayed a flier in Paul Array's plane at an air show that offered to make customers a six-place Seawind. *See* Ex. P–14. Also during the same time frame, Karlsen sent a letter to a prospective customer that said, "It is our ultimate intention to modify and stretch the molds as necessary to make a 6 place plane." *See* Ex. P–13.

Defendants claim that the only reason they made the molds was to make carbon fiber epoxy parts for Array's own Seawind to replace the original SNA-provided fiberglass parts and lighten the plane. Defendants claim that Array's finished Seawind is considerably heavier than the weight SNA advertised at the time Array bought his kit. Plaintiffs argue that defendants made the molds made with the intent to use those molds to create a counterfeit Seawind aircraft called the Harpoon that Turbine Design, with Paul Array's help, would then manufacture and market as a competitor to the Seawind.

The court agrees with plaintiffs that it is not credible that defendants were making the molds for the sole purpose of building lighter parts for Array's plane. Most persuasive is that as soon as the stolen canopy arrived (the full story of which will be discussed below), Karlsen took it to Piranha Boats and directed them to make a mold of it, even though defendants have never contended that Array wanted a carbon fiber canopy. Also, Karlsen's own words in his letter to a customer make the plan explicit: "It is our ultimate intention to modify and stretch the molds as necessary to make a 6 place plane." P–13. The court is convinced that defendants were in fact planning to do more than make just one replacement part for Array, given that they were, at the same time, advertising the Harpoon.

Moreover, even if the sole purpose was to create a single set of parts from a lighter material for Array's plane, making the molds violated the contracts, which plainly say, "the making of molds from parts is in violation of this Agreement." There is no requirement that the entire plane must be copied or that the copied parts must be used to create a competitor product in order to constitute a breach.

The fact that the contract allows the purchaser "to make parts or accessories for the aircraft not available from SNA, Inc." does not provide a defense for defendants' actions. They argue that because the parts they were going to make from the molds were to be made out of a different material than the original parts, that makes them different parts not available from SNA and thus a part defendants are contractually permitted to make. This argument is unavailing, for the simple reason that a hull is available from SNA. The reasonable reading of the provision is the most straightforward—builders may make parts SNA does not provide (such as the engine, or interior accessories), not parts SNA provides but in a different material. To read the contract in the way that defendants propose would be unreasonable, because it would contradict the explicit prohibitions against making molds and copying parts.

Thus, by defendants' own admissions, they have breached the contracts. Plaintiffs are entitled to have the molds returned to them, and the court will order defendants to do so. Plaintiffs have not demonstrated any damages caused by the breach of contract, so there is no basis for a monetary damage award.

*Civil Conspiracy*

▆▆▆ To prove a civil conspiracy under Pennsylvania law, a plaintiff must show the following elements:

(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. Proof of malice or an intent to injure is essential to the proof of a conspiracy.

*Strickland v. University of Scranton,* 700 A.2d 979, 987–88 (Pa.Super.Ct.1997); *see also Skipworth v. Lead Indus. Ass'n, Inc.,* 547 Pa. 224, 690 A.2d 169, 174 (Pa.1997). In Pennsylvania, "punitive damages are awarded for 'outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interest of others.'" *Shared Communications Services of 1800–80 JFK Blvd., Inc. v. Bell Atlantic Properties, Inc.,* 692 A.2d 570, 576 (Pa.Super.Ct.1997), *quoting Martin v. Johns–Manville Corp.,* 494 A.2d 1088, 1097–98 (Pa.1985).

■ Karlsen and his company conspired with Glen Reece to acquire by theft a canopy from KNG/Ken Wheeler. The evidence shows that the canopy and cowlings that Turbine Design purchased from Glen Reece were stolen from KNG/Ken Wheeler, based on Reece's testimony about the events and Silva's inventory that revealed a missing canopy. The evidence further shows that Karlsen knew that the parts were stolen. His insistence that the canopy came from Glen Reece and that Karlsen had no idea where Reece got it is simply not credible, especially in light of Reece's forthright testimony about the transaction. Given his clear pride in the operation, the court is convinced that his testimony is credible that he was equally forthright in telling Karlsen how he was going to get the canopy. Turbine Design is no more allowed to steal parts through a middleman than it is allowed to steal directly.[5]

There is no evidence to show that Array knew about this agreement to steal parts, although he was a party to the underlying plan to make molds from parts (also, there is no civil conspiracy allegation in the complaint against him).

The use of the stolen parts in the copying scheme caused plaintiffs actual damages of approximately $5,500 (the worth of the stolen canopy and cowlings) for which they are entitled to compensation. Considerations of punishment and deterrence for the outrageous way defendants set out to injure plaintiffs toward whom they harbor such malice justifies punitive damages against Karlsen and Turbine Design in the sum of $10,000.[6]

*Trademark Infringement and Unfair Competition*

■ As the court previously ruled in deciding the preliminary injunction motion, the plaintiffs have a common law trademark in the word "Seawind."[7] Plaintiffs have brought a claim for false designation under § 43(a) of the Lanham Act, which provides, in pertinent part, that:

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination there-

5. Karlsen's fervent protestations that he had no choice but to acquire parts elsewhere for Hatfield's plane because SNA refused to provide parts to Hatfield without a contract are not compelling. Hatfield decided to purchase a partially built plane and then decided, at Karlsen's urging, to refuse to contract with the sole supplier of the parts that could finish the plane. It cannot be surprising or pitiable, then, that Hatfield and Karlsen found themselves without a finished plane.

6. Arguably, plaintiffs are entitled to only their lost profits on the sales of the stolen parts, and the compensatory damages should thus be less than $5,500. Therefore, alternatively, the difference between the lost profits and the stated worth of the parts is assessed as punitive damages.

7. The court also ruled that the plaintiff's registered trademark consists of the composite mark of the word "Seawind" with a representation of a plane above it and two wavy lines below it, and that there is no evidence that any defendant infringed that mark.

of, or any false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities, ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). This section "proscribes not only trademark infringement in its narrow sense, but more generally creates a federal cause of action for unfair competition." *Duraco Prods., Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1438 (3d Cir.1994).[8] The test is whether defendants' use of a mark is likely to cause confusion as to defendants' or defendants' product's affiliation with plaintiff. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 473 (3d Cir.1994). The Third Circuit employs a ten-factor test to determine the likelihood of confusion. *See id.* In ruling on the preliminary injunction motion, the court set forth and applied the test, and those findings are adopted here.[9] The findings as to each use at issue follow.

*seawind.net*

■ For the reasons explained in the preliminary injunction findings, Horizon Unlimited's use of plaintiffs' exact mark for defendant's website address is highly likely to cause confusion. *See Jews for Jesus v. Brodsky*, 993 F.Supp. 282 (D.N.J.), *aff'd*, 159 F.3d 1351 (3d Cir.1998); *Planned Parenthood Fed'n of Amer. v. Bucci*, Civ. A. No. 97–629, 1997 WL 133313 (S.D N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998). The preliminary injunction against defendants' use of this domain name will be made permanent.

*Meta Tagging* [10]

■ Plaintiffs argue that the use of the word "Seawind" in meta tagging the seawind.net site is an unfair trade practice. *See* Pl.Ex. 62 at 102, 106 (illustrating defendants' practice of typing a block of text repeating the words "Seawind," "SEAWIND," and "seawind" many times). The court agrees that defendants intentionally use plaintiffs' mark in this way to lure internet users to their site instead of

---

8. The court has previously referred to this set of claims as plaintiffs' trademark infringement claims. Because of the particular type of confusion alleged by plaintiffs, and because the court ruled that only plaintiffs' unregistered mark is at issue, § 43(a) is the proper vehicle for redress. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986) (explaining that section "extends protection to unregistered trademarks on the principle that unlicensed use of a designation serving the function of a registered mark constitutes a false designation of origin and a false description or representation").

Besides false designation of origin, one of plaintiffs' witnesses (Alex Sluzas) mentioned false advertising by defendants, which is another type of claim under § 43(a)'s unfair competition rubric. Presumably this is based on the same statements alleged by plaintiffs to constitute commercial disparagement. To whatever extent this claim is advanced, it fails for the reason discussed in connection with the disparagement claim, namely that plaintiffs have not succeeded in proving the falsity of any particular statement made by defendants.

9. Plaintiff presented additional evidence during trial on the market strength of the Seawind mark. On that fuller record, the court is persuaded that its prior finding that the mark is weak was wrong, and the court now finds that the mark is a strong one. That finding does not alter the outcome of any of the determinations of likelihood of confusion.

10. "[M]eta tags are not visible to the websurfer although some search engines rely on these tags to help websurfers find certain websites. Much like the subject index of a card catalog, the meta tags give the websurfer using a search engine a clearer indication of the content of a website." *See Playboy Enter., Inc. v. Welles*, 7 F.Supp.2d 1098, 1104 (S.D.Cal.1998).

SNA's official site. This is true whether the meta tagging is visible or hidden in the code, and no matter what the website's domain name is. This case can be distinguished from *Playboy Enterprises, Inc. v. Welles,* 7 F.Supp.2d 1098 (S.D.Cal.1998), in a crucial way: In that case, the court found that defendant "used plaintiff's trademarks in good faith to index the content of her website." *Id.* at 1104. Here, based on the repetitious usage and the evidence of defendants' general intent to harm plaintiffs, the court cannot find that this use is a similar good faith effort simply to index the content of the website; instead, it is a bad faith effort to confuse internet users that is likely to succeed. Defendants' meta tagging will thus be enjoined.

### The Seawind Builders Newsletter

■ As the court indicated in the preliminary injunction findings, the newsletter's name is itself not likely to cause confusion in its readers. However, the court finds that because of the internet site's prior use of a confusing domain name, the use of the newsletter name on the internet site is likely to be confusing. Therefore, where the newsletter is displayed on the site, defendants shall display the following disclaimer: "The Seawind kit is sold exclusively by SNA, Inc. The Seawind Builders Newsletter is not sponsored by, approved by, or affiliated in any way with SNA, Inc." If defendants use the newsletter name as the website's domain name (as Array stated during the trial has been applied for), the same disclaimer shall be displayed on the front page of the site. The court will not order that this disclaimer be used on the paper copies of the newsletter but does repeat that an important factor in its finding that the name is not likely to confuse readers is the use of a disclaimer of some sort, whether

the one used in the past or the court's newly drafted one.

### Turbine Seawind

■ As the court previously ruled, the defendants' use of the phrase "Turbine Seawind" is not likely to cause confusion. Particularly persuasive is the fact that it is consistent with the commonly used shorthand method for referring to any plane powered by a turbine engine.[11]

### Trade Dress Infringement,

Plaintiffs claim product configuration trade dress protection for a combination of elements in the Seawind's design that gives the plane a sleek, swept-back look. They claim that by marketing and manufacturing either the Harpoon or the SeaStar, defendants are infringing on that trade dress, which constitutes a violation of 15 U.S.C. § 1125(a).

### Harpoon

Because there is no Harpoon product yet, and the evidence strongly suggests that there never will be, there is no product to compare to the Seawind. Thus, plaintiffs have not met their burden of proving the Harpoon infringes on the Seawind's trade dress.

### SeaStar

■ The plaintiffs allege that the defendants' abandoned efforts in producing and marketing the Harpoon were transferred to a project called the SeaStar. The SeaStar is a kit plane being developed by Craig Easter and his company Precision Design, Inc. in Oklahoma. No SeaStar has yet been made—it is still in the formative stages. Plaintiffs believe, based on the sketches on the internet site and the other marketing efforts, that the finished product will look confusingly like the Seawind. Mr. Easter vigorously asserts that it will not. In any case, plaintiffs

11. The complaint against Array mentioned his use of the name "Seawind Pilots Association." No evidence was submitted nor argument made as to this use, and thus plaintiffs have not met their burden of proof in showing that the use constitutes a Lanham Act violation.

have not proven that any of the defendants here are involved in the SeaStar project. Mr. Easter disclosed who the project's investors are, and none of them are defendants here. Plaintiffs rely on a statement on Turbine Design's internet site that Turbine Design and Precision Design have "formed an alliance" to make the SeaStar, but what this means is not clear enough to meet plaintiffs' burden of proof. Karlsen testified that he will install turbine engines in SeaStars if SeaStar customers so desire, but that will be his total involvement in the project. Array will be writing a newsletter. See Ex. P–62 at 53. The court cannot find from this evidence that defendants are the responsible parties for the SeaStar, and thus it is not necessary to consider whether the SeaStar violates any trade dress rights of the Seawind.[12]

*Defamation and Commercial Disparagement*

Plaintiffs allege that through their websites and in individual emails and letters, defendants have defamed Silva and SNA and have disparaged their products. The defendants argue that all such commentary is merely opinion or it is privileged because it offers information of benefit to the community of Seawind owners and prospective buyers.

 Under Pennsylvania law, a plaintiff must prove the following elements in a defamation claim: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and, if raised by the defense, (7) abuse of a conditionally privileged occasion. When relevant to the defense, the defendant has the burden of proving (1) the truth of the defamatory communication; (2) the privileged charac-

ter of the occasion on which it was published; and (3) the character of the subject matter of defamatory comment as of public concern. See 42 Pa.C.S. § 8343; *Miketic v. Baron,* 450 Pa.Super. 91, 675 A.2d 324, 327 (Pa.Super.Ct.1996).

 A communication is defamatory if it tends to harm the reputation of another so as to lower that person in the estimation of the community or deter third persons from dealing with him or her. See *Walker v. Grand Central Sanitation, Inc.,* 430 Pa.Super. 236, 634 A.2d 237, 240 (Pa.Super.1993) "A statement which ascribes to another conduct, character, or a condition which would adversely affect [his] fitness for the proper conduct of [his] lawful business, trade or profession" is defamatory per se. *Walker,* 634 A.2d at 240.

 A defamatory communication may consist of a statement in the form of an opinion only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. See *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987). The webpage that serves as the introduction to the back issues of the newsletters says this: "Our goal is to keep you informed about the SEAWIND and to keep the kit builder honest about there [sic] claims. Before you purchase a Seawind you should learn everything you can about it, whether the facts are what you want to hear or not. Do not take anything written here as derogatory. Take it as fact. We can prove anything we write and are happy to do so." Ex. P–62 at 200.

The type of statements made on Horizon Unlimited's webpage is seen by examining the site's "Seawind Information Menu," which is in essence a table of contents to all the Seawind-related materials on the site. See Ex. P–25. It contains each back issue of the Seawind Builders Newsletter and some listings with titles such as "My Plane" and "A Plane Called the Seawind." It also contains an entire sections called

---

12. This is also true for plaintiffs' assertions that Precision Design is using a logo for the

SeaStar that infringes on plaintiffs' registered trademark Seawind logo.

"SNA and Dick Silva," with titles including "Dick Silva commits Patent Fraud," "Dick Silva copies parts," and "Dick Silva copies more parts." Every listed title is a link to a page of the site that then contains detailed materials and commentary on the named topic. Counsel pointed to these statements in particular: "SNA is wrong, they are lying, they are unworthy to be a kit manufacturer and deal with the public. They are selling unsafe parts and they need to be stopped. We have proof. That proof is available for any of you to see." Ex. P–62 at 201. These statements are defamatory per se and about plaintiffs.

■■■■ The traditional rule was that in a defamation per se case, damages were presumed and did not need to be proven. In *Walker v. Grand Central Sanitation,* 430 Pa.Super. 236, 634 A.2d 237, 241–45 (Pa.Super.Ct.1993), the Pennsylvania Superior Court modified that rule. *Walker* held that according to the Restatement, which accurately states the law of Pennsylvania, "a plaintiff in a slander per se case must show 'general damages': proof that one's reputation was actually affected by the slander, or that she suffered personal humiliation, or both." *Id.* at 242. It also held that the new rule "presumably does not overrule the long line of cases in our Supreme Court which hold that a slander per se is actionable without proof of special damages." *Id.* The court reasoned,

> Requiring the plaintiff to prove general damages in cases of slander per se accommodates the plaintiff's interest in recovering for damage to reputation without specifically identifying a pecuniary loss as well as the court's interest in maintaining some type of control over the amount a jury should be entitled to compensate an injured person. On one hand, a slander per se plaintiff is relieved of the burden to actually prove pecuniary loss as the result of the defamation; yet on the other hand, a jury will have some basis upon which to compensate her.

*Id.* at 244. So, to recover based on the defamatory per se statements, Silva need not show pecuniary loss caused by them, but he must show general damages. Plaintiffs have not made the required demonstration, because there is no credible evidence of reputational damage and no credible evidence of personal humiliation from the statements.

■■■ Plaintiffs next claim that defendants' criticism of the Seawind constitutes actionable disparagement of the product. In order to establish an action for commercial disparagement, the plaintiff must prove the following elements: "(1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; (2) that no privilege attaches to the statement; and (3) that the plaintiff suffered a direct pecuniary loss as the result of the disparagement." *U.S. Healthcare v. Blue Cross of Greater Phila.,* 898 F.2d 914, 924 (3d Cir.1990), *citing Menefee v. Columbia Broadcasting Sys., Inc.,* 458 Pa. 46, 329 A.2d 216 (Pa.1974). The purpose of a commercial disparagement action is to "compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability," *id.;* it is not to vindicate the plaintiff's business reputation and good name.

The court cannot find either that plaintiff succeeded in proving that defendants' claims are false or that defendants succeeded in proving that their claims are true. The court heard may hours of testimony from various witnesses put on by both plaintiffs and defendants and received into evidence multiple expert reports, all relating to aspects of the Seawind's performance. Presumably this all goes to the truth or falsity of defendants' claims about the plane's deficiencies. None of the voluminous testimony was ever tied to any particular statements, nor was it presented in a way that is at all helpful to the court in deciding any of the issues in the case. The court questioned all the lawyers about this a number of times during testimony

that was particularly far afield, and each time counsel persisted, apparently under the same mistaken belief as their clients that this lawsuit is the forum for proving the quality of the Seawind to the world. It is not. That determination is for the market.

 Plaintiffs have failed to prove the required damage. Unlike a defamation action, a plaintiff claiming commercial disparagement must prove actual pecuniary loss. *See U.S. Healthcare,* 898 F.2d at 924. Plaintiffs cannot prove any lost sales or other actual damages attributable to the defendants' puerile campaign of commercial defamation. In arguing the effect that there has been on their business, they blame the internet activities of defendants in total. In proving that defamation or disparagement caused damage to plaintiffs, though, it is not enough to provide evidence that in general the content of defendants' internet sites caused damage, because the websites also contain much non-defamatory information about and criticism of the plane. The court does not mean to imply that the criticism is correct [13]; but it is a legitimate type of speech, and much of it, even apart from the defamation that is mixed in throughout, is information that might well give prospective customers pause. Two of the major examples are reports of the various lawsuits in which plaintiffs have been involved and crashes Seawinds have had. The plaintiffs do not like the form in which these reports are made, but at bottom there is no denying that SNA's relatively short corporate history has been beleaguered with litigation, and some Seawinds have crashed. Quite apart from the particular manner in which defendants present these events, the underlying facts themselves could well dissuade potential buyers from embarking on a long, expensive relationship with the company, even enough buyers to account for the drop in sales since the high water mark of twenty-eight in 1997.

Testimony of particular lost sales due to the materials on the internet is not credible. The plaintiffs' sales manager plainly displayed a tendency to exaggerate. Nor are Silva, Karlsen, and Array entirely credible witnesses. Each is driven by motivations other than truth telling to continue an irrational vendetta over plaintiffs' hobby kit. It is difficult to believe any of the main players. Mr. Silva and his sales manager exaggerate the impact of defendants' conduct on plaintiffs' sales. Mr. Karlsen does not testify truthfully about his knowledge of the stolen parts. Mr. Array lies to conceal his incarceration for federal crimes in the past. These people act out of hatred for each other over a hobby kit. Much of the mutual name calling has at least a kernel of truth.

In sum, the plaintiffs have not met their burden of proving an entitlement to permanent injunctive relief against criticism of their product. The court understands its authority to enjoin false and misleading commercial speech. However, the public interest favors robust criticism of plaintiffs' aircraft. The kit produces a product that has been involved in several accidents. Defendants argue that the aircraft is overweight and unsafe.[14] Plaintiffs argue that any fault lies in the propeller or the assembly of the kit for which they are not responsible. Both sides have part of the truth; both sides exaggerate. Defendants claim plaintiffs are litigious; they are, but it is nearly impossible to assess the merits of the various lawsuits in which plaintiffs are involved. The point is that the public interest is best served by the debate in the marketplace over the risky, experimental hobby kit. "The main remedy ... is not an injunction to suppress the message, but

---

**13.** In fact, the evidence presented seems to indicate that defendants do have a tendency to make sweeping generalizations about the Seawind's performance based on their experiences with a very small number of planes.

**14.** The argument about weight turns on nice distinctions about what is added to the basic aircraft.

a rebuttal to the message. As Justice Brandeis long ago stated, 'if there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence.'" 5 McCarthy § 31:148 at 31–216, *quoting Whitney v. People of the State of California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), *overruled in part by Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

*Trade Secrets*

 Plaintiffs claim that by making molds of Seawind parts, defendants Karlsen and Turbine Design have misappropriated their trade secret. This claim fails because plaintiffs have not shown that there is any protectable trade secret involved.

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1255 (3d Cir.1985) (setting forth the Pennsylvania standard adopted from the Second Restatement). Trade secret law does not offer protection against reverse engineering. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *SI Handling,* 753 F.2d at 1255. Patent law gives protection against copying a product, but trade secret law does not. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 160, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Plaintiffs have not shown any other trade secret to have been misappropriated by defendants.

*Interference with Contractual Relations and Interference with Prospective Business Relations*

 Plaintiffs claim that defendants interfered with their contracts or prospective contracts with Seawind owners Jimmy Hatfield, Jorge Ortiz, John Hare, and Len Carlson. To prove a claim of intentional interference with contractual relations, either existing or prospective, a plaintiff must establish the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.Ct.1997). "The Pennsylvania Supreme Court has defined 'prospective contractual relation' as 'something less than a contractual right, something more than a mere hope.' In short, it is 'a reasonable' probability' that contractual relations will be realized." *U.S. Healthcare v. Blue Cross of Greater Phila.,* 898 F.2d 914, 925 (3d Cir.1990), *quoting Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 471 (Pa.1979).

 As for the four named individual customers, the court does not find purposeful action by Karlsen that caused legal damage to plaintiffs. Karlsen called Carlson to try to persuade him to buy an engine or other parts from Turbine Design. This is not tortious interference; Karlsen is allowed to solicit business for his own company, even from plaintiffs' customers. Silva did not want to sell to Ortiz because Ortiz is a lawyer who wanted to install a turbine engine, and Silva thought the chance of a lawsuit from a lawyer customer was too high. Even if defendants persuaded Ortiz to install a turbine engine, that in itself is not interfering with

plaintiffs' prospective contract with Ortiz; Silva himself made the decision not to sell on that condition. Instead of buying a "Kwick Kit" (which is a partial assembly done by SNA), Hare bought a partially completed plane on the aftermarket and bought the remaining parts from SNA. Hatfield took over someone else's kit that had been purchased from SNA and declined to purchase the remaining necessary parts from SNA. There is no evidence as to what, if anything, defendants did to cause Hare and Hatfield to make these decisions. Neither is there any evidence as to actual damages caused.[15]

■ Plaintiffs also argue that through their internet sites, defendants interfere with plaintiffs' prospective contracts because prospective customers will see the sites and be dissuaded from ever contacting SNA. This conclusory speculation certainly cannot form the basis of an action, because there is no evidence of a reasonable probability that a contract will be realized with the hypothetical internet user, nor any of economic loss to plaintiff caused by defendants.

**15.** Even if the court were to find that defendants interfered in SNA's prospective contract with Hatfield, the damages Silva testified to at trial were the stolen parts, for which the court is already awarding plaintiffs compensatory damages under the civil conspiracy claim.

**16.** First, there is a serious question as to whether this court has subject matter jurisdiction, which depends on whether an actual controversy exists between these parties on this issue. *See* 28 U.S.C. § 2201. For a claim seeking to invalidate a patent,

> the statutory requirement is satisfied when "a defendant's conduct has created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question," and when the plaintiff has "actually produced the accused device" or has "prepared to produce such a device." The required reasonable apprehension must be an objective, not purely subjective apprehension.

*International Medical Prosthetics Research Associates, Inc. v. Gore Enterprise Holdings, Inc.,* 787 F.2d 572, 575 (Fed.Cir.1986), *quoting Jer-*

*Patent Validity*

■ In their counterclaim, defendants Karlsen and Turbine Design argue that Silva's design patent for the Seawind patent should be invalidated because he committed fraud in the application by stating that he was the inventor. This claim fails. Plaintiffs, through Mr. Silva, are rigid, inept and careless but the patent application they filed and their assertions of patent protection were in fact arrogance rather than fraud.[16]

Defendants have shown no basis for invalidating the patent because they have not made a showing of patent fraud. Silva thought that, as he put it, he "stood in the shoes" of the inventor Roger Creelman in applying for the patent. He has never claimed to have invented the Seawind, and he has freely admitted that Creelman did. He filled out the application without legal advice, and he made a mistake. That conduct does not constitute patent fraud. *See In re Multidistrict Litigation Involving Frost Patent,* 540 F.2d 601, 604 (3d Cir. 1976) (a finding of patent fraud requires an intent to defraud).

*vis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1398–99 (Fed.Cir.1984).

Defendants can have no reasonable apprehension that plaintiffs will sue for patent infringement because defendants are aware that plaintiffs have not relied on their patent for several years because they discovered a problem with it. Defendants contend that, given that plaintiffs have sued others in the past for patent infringement based on alleged conduct similar to that plaintiffs allege of defendants here (i.e., copying parts of the Seawind), they have a reasonable apprehension. However, Silva has stated multiple times during his testimony before this court that he does not consider himself to have a valid patent. His past history of suing for patent infringement does not contradict those claims, as that suit was before the discovery of the prior art problems. Moreover, it seems probable that if plaintiffs were going to sue for patent infringement, they would have done so in this case along with the several other closely intertwined claims, and they have not.

*Other Counterclaims*

Defendants have not met their burden of showing that the cancellation of plaintiff's registered mark is warranted. *See* 15 U.S.C. § 1119. Defendants have not made the required showing to prove that plaintiffs violated any antitrust laws—this claim was apparently abandoned, and no evidence was presented or argument made. The other counterclaims are basically requests for declarations that plaintiffs are wrong in their claims, and those are resolved by the above resolutions of plaintiffs' claims.

*Conclusion*

Plaintiffs have proved that defendants breached their contracts, and the resulting molds will be returned. Plaintiffs have proved that defendants Karlsen and Turbine Design conspired to steal parts from them, and they will be compensated for their resulting damages. Plaintiffs have not proved damages from the defamation and disparagement by defendants. Plaintiffs have not proved that defendants' use of the words "Turbine Seawind" or "The Seawind Builders Newsletter" constitute unfair trade practices, but they have proved that the use of the "seawind.net" domain name and the practice of meta tagging the site with the word "Seawind" are. Defendants Array and Horizon Unlimited will be enjoined from using that domain name, and they will also be enjoined from meta tagging their site with the word "Seawind." Further, they will be enjoined to use a disclaimer when posting the newsletter on their internet site. Plaintiffs have not proved any other claim of unfair competition, including misappropriation of trade secrets. Plaintiffs have not proved that defendants interfered with their contracts or prospective contracts. Defendants have not carried the burden of proof on any of their counterclaims.

An appropriate Order of Judgment follows.

**FINAL JUDGMENT**

**AND NOW,** this 9th day of June, 1999, after a bench trial on the merits, it is hereby **ORDERED** as follows:

1. Defendants Douglas Karlsen, Turbine Design, Inc., Paul Array, and Horizon Unlimited, Inc. shall deliver to plaintiffs all molds made from any Seawind parts.

2. The preliminary injunction set forth in the court's Order dated May 28, 1999 is made permanent. Defendants Paul Array and Horizon Unlimited, Inc. are enjoined from using the domain name "seawind.net" for any website.

3. Defendants are enjoined from meta tagging their websites, whatever the domain name, with the word "Seawind."

4. Wherever the Seawind Builders Newsletter is displayed on Horizon Unlimited's or Paul Array's website, the following disclaimer shall be displayed: "The Seawind kit is sold exclusively by SNA, Inc. The Seawind Builders Newsletter is not sponsored by, approved by, or affiliated in any way with SNA, Inc." This disclaimer shall be displayed on the page of the website that contains the links to each issue, and it shall be displayed in font at least as prominent as the other text on the page.

5. Judgment is **ENTERED** in favor of plaintiffs and against defendants Douglas Karlsen and Turbine Design, Inc., in the sum of $5,500 compensatory and $10,000 punitive damages.

6. Judgment is **ENTERED** in favor of plaintiffs and against defendants on the counterclaims.