**ELI LILLY AND COMPANY,**
an Indiana corporation,
Plaintiff,

v.

**NATURAL ANSWERS, INC., a Florida corporation, and Brian Alexander Feinstein, Defendants.**

No. IP 99–1600–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 20, 2000.

James H. Ham, III, Baker & Daniels, Indianapolis, IN, Jeffrey A. Schwab, Abelman Frayne & Schwab, New York, NY, for Eli Lilly and Co.

James A. Richardson, Locke Reynolds LLP, Indianapolis, IN, R. Lawrence Bonner, Homer Bonner & Delgado, P.A., Miami, FL, for Natural Answers, Inc., Brian Alexander Feinstein.

## ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

HAMILTON, District Judge.

Plaintiff Eli Lilly & Company ("Lilly") manufactures and sells fluoxetine hydrochloride under the federally registered trademark PROZAC ®. PROZAC ® is a prescription drug used to treat clinical depression and some other psychological conditions. Defendant Natural Answers, Inc. manufactures and sells a blend of St. John's Wort and several other herbs under the name HERBROZAC. Natural Answers has been advertising HERBROZAC over the Internet as "a very potent and synergistic formula, designed to promote Mood Elevation," and as "a powerful, and effective all-natural and herbal formula al-

ternative to [the] prescription drug Prozac."

Lilly has sued Natural Answers and its founder, Brian Alexander Feinstein, under the Lanham Act for federal trademark infringement and for dilution of PROZAC ® as a famous trademark. See 15 U.S.C. § 1125(a) & (c). On December 16, 1999, Lilly moved for a preliminary injunction to prevent Natural Answers from continuing to market its product using both the HERBROZAC name and references to PROZAC ® in its Internet advertising. The court held a hearing on December 28, 1999, and has considered additional post-hearing briefs.

When the court rules on a motion for a preliminary injunction, it makes a preliminary judgment based on an incomplete factual record. Its findings of fact and conclusions of law are subject to revision based on more complete information later in the case. As explained below, however, Lilly has made a powerful case of both trademark infringement and dilution of a famous trademark. Lilly has also established the other elements of a preliminary injunction. The court therefore grants Lilly's motion for a preliminary injunction against further use of the HERBROZAC name and mark and further use of references to PROZAC ® in the source code of the Natural Answers web site. Pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure, the court now states its findings of fact and conclusions of law.

### Findings of Fact

#### I. Lilly's PROZAC ®

Since 1988, using the trademark PROZAC ®, plaintiff Lilly has sold fluoxetine hydrochloride throughout the United States and in many countries around the world. Lilly has marketed the medicine primarily to treat depression. The medicine has also proven useful in treating bulimia nervosa and obsessive-compulsive disorder.

Lilly owns United States Trademark Registration No. 1357582 for PROZAC ® as used for pharmaceutical products. The registration was issued September 3, 1985,

and has become incontestable as a matter of law. See 15 U.S.C. § 1065.

As a prescription drug, PROZAC ® is not freely available to patients who seek to use it to relieve depression or other conditions. A licensed physician must prescribe the medicine, and a licensed pharmacist must fill the prescription for the patient. Lilly's advertising of PROZAC ® has been aimed at physicians and pharmacists, and not directly to potential consumers.

PROZAC ® is the best-selling prescription antidepressant in the United States. Since 1988, doctors have prescribed PROZAC ® more than 240 million times for more than 17 million Americans. PROZAC ® sales in the United States alone have totaled more than $12 billion since 1988.

Over the last eleven years, fluoxetine hydrochloride and the PROZAC ® mark have received an extraordinary amount of attention from the news media. The product has achieved extraordinary fame in American culture. PROZAC ® is the best known brand of a new generation of medications that have been developed and are being developed to treat not only depression but a host of other psychological conditions more effectively than has been possible before. See, e.g., Pl.Ex. 1–3 at 37 (Newsweek cover story entitled "Beyond Prozac," Feb. 7, 1994).

Lilly has submitted a sampling of newspaper and magazine articles and books about PROZAC ® that evidence this fame. In 1993, for example, Penguin Books USA published Peter D. Kramer's book Listening to Prozac, and in 1994, The Berkley Publishing Group published Elizabeth Wurtzel's Prozac Nation: Young and Depressed in America. Both books were national bestsellers. PROZAC ® has been featured twice on the cover of Newsweek and once on the cover of The Saturday Evening Post, among other national magazines.

Major broadcasting networks have also featured PROZAC ® in national stories.

For example, in 1991 CBS broadcast a story titled "What About Prozac?" on *60 Minutes*. In 1995, ABC broadcast a story called "Beyond Prozac" on *Good Morning America*. The *Oprah Winfrey Show* carried a story called "Prozac" in 1994. A health care industry advertising publication called *MedAdNews* named PROZAC its "brand of the year" for 1993.

As further evidence of the fame of the mark, in the flurry of retrospective looks at the 20th Century, *Fortune Magazine* identified PROZAC ® as one of the top six products of the century in the category of health and grooming. Pl.Ex. 1–10.[1]

Lilly has submitted an article from the *Baltimore Sun* of September 21, 1993, that sums up the fame PROZAC ® achieved within just a few years of its initial launch as a brand. After referring to the use of PROZAC ® in punch lines in a Woody Allen film and a *New Yorker* poem, the author wrote:

> Prozac entered the popular lexicon almost immediately after its introduction six years ago. It's been on the cover of Newsweek and shared the stage with Phil and Geraldo; it continues to turn up in the monologues of comedians and the cultural references of the ironic. It's a designer label, a buzzword, a brand name familiar to not only the 4.5 million Americans who have taken it, but also those who wonder if they, too, might find a cure for whatever ails them in the little green-and-off-white capsule.

Pl.Ex. 1–6.

As further evidence of PROZAC ®'s fame, searches of computerized databases turned up extraordinary numbers of responses. A search of the Internet for "Prozac" using the Altavista search engine on November 29, 1999, found 63,150 web pages. Pl.Ex. 2–8. A November 29, 1999, search of the Westlaw database ALL-NEWS for the word Prozac and a date after 1997 produced more than 10,000 stories. Pl.Ex. 2–9. The Westlaw database DOW JONES MAJOR NEWSPAPERS covers only 48 major newspapers. A November 29, 1999, search of that database for "Prozac" over the last ten years turned up more than 12,000 references, or an average of more than 250 stories for each newspaper included in the database. Pl. Ex. 2–10.

## II. *HERBROZAC and its Marketing*

Defendant Natural Answers' HERBRO-ZAC is part of a line of products that Natural Answers calls HERBSCRIP-TIONS ®. These products are manufactured from a variety of herbs and other natural substances. Natural Answers markets these products over the Internet from a site marked <www.naturalanswers.com/>. Natural Answers has not yet arranged for distribution through "brick-and-mortar" retail stores, but it is actively seeking to do so.

The HERBSCRIPTIONS ® line of products includes HERBROZAC, as well as HERBALIUM, VITA–AGRA, CLIMA-GRA, HERBOCET ®, ZONK OUT, HerbenolPM, HERBASPRIN ®, and HER-BADRYL ®. Pl.Ex. 2–1 (printout of Natural Answers home page on Nov. 29, 1999).

Natural Answers tries to walk a fine line in its business. On one hand, Natural Answers attempts to draw a sharp distinction between its herbal formula dietary supplements and the drugs manufactured by pharmaceutical companies like Lilly. Natural Answer takes care to claim that its products are not "intended to diagnose, treat or cure any disease." See, *e.g.*, Feinstein Aff. ¶¶ 19, 4. This distinction is important for both marketing and legal reasons.

Natural Answers does not want to subject its products to regulation by the Food and Drug Administration. The FDA

---

1. By way of comparison, the other five in that category were the safety razor, BAND–AIDS ®, penicillin, TAMPAX ® tampons, and birth control pills, and in the field of travel, the top five were the DC–3, the Harley–Davidson motorcycle, the Ford Model T, skateboards, and the Boeing 707.

treats Natural Answers' dietary supplements as "foods" that are not subject to the FDA's drug approval process. This regulatory treatment of the products as "foods," however, requires Natural Answers to make clear in its labeling that its products are not FDA-approved and are "not intended to diagnose, treat, cure, or prevent any disease." 21 U.S.C. §§ 321(ff), 343(r)(6)(C). Nevertheless, Natural Answers wants to market its products as natural alternatives to manufactured pharmaceuticals. Natural Answers markets its products as "dietary supplements" that are "intended to promote the body's natural functions." Feinstein Aff. ¶ 5.

Natural Answers markets all the HERBSCRIPTIONS ® products as alternatives to drugs. The company's web site makes a direct comparison between "herbs" and "drugs" that portrays herbal formulas in an entirely positive light and as alternatives to drugs.

One way in which Natural Answers tries to suggest the benefits of its products is by giving them names that suggest an association with well-known drug brands or families of drugs. As explained below in the discussion of the similarity of the marks in question, the association between PROZAC ® and HERBROZAC is strong and intentional. Natural Answers chose a name similar to PROZAC ® rather than a name similar to other antidepressant drugs because PROZAC ® is the most famous and best-selling antidepressant drug. See Tr. 40, 43–44 (Feinstein cross-examination). Natural Answers has advertised HERBROZAC as "a very potent and synergistic formula, designed to promote Mood Elevation!" Pl.Ex. 2–1. Natural Answers also has advertised HERBROZAC as "a powerful, and effective all-natural and herbal formula alternative to prescription drug Prozac." Pl.Ex. 2–2 (source

code for Natural Answers home page as of Nov. 29, 1999).[2]

Natural Answers' Feinstein testified at the hearing that the other product names in the HERBSCRIPTIONS ® line attempt to suggest similar associations. Natural Answers promotes HERBALIUM as a formula to promote "deep relaxation," and the name is intended to suggest an association with the brand-name drug VALIUM. Natural Answers promotes VITA–AGRA as enhancing men's sexual performance, and the name is intended to suggest an association with the Pfizer brand-name drug VIAGRA ®.[3] Natural Answers promotes HERBOCET ® as a pain reliever, and its name is intended to suggest an association with a family of pain relief drugs using the suffix "cet," such as Lorcet, Darvocet, and Percocet. Natural Answers promotes HerbenolPM as suitable for headaches and a good night's sleep, and the name is intended to suggest an association with TylenolPM ®. Natural Answers promotes HERBASPRIN ® for pain relief, and the name is intended to suggest an association with aspirin. Similarly, the name of the Natural Answers product HERBADRYL ® is intended to suggest an association with BENADRYL ®.

On cross-examination, Feinstein tried hard to avoid admitting that the names were intended to suggest an association with these famous name-brand drugs. He tried to phrase his answers in terms of suggesting an association not with the name-brand drugs themselves but with the functions or benefits of those drugs. See Tr. 49–52. Feinstein's balancing act does not withstand a moment's scrutiny. His chosen product names suggest the intended functions or benefits of name-brand drugs precisely because consumers are familiar with the names and benefits of the famous drugs.

**2.** During December 1999, Natural Answers revised its advertising to remove explicit references to PROZAC ® and deleted the use of "Prozac" in the "metatags" in the source code for its web page. See page 839, *infra.*

**3.** Natural Answers' web site and product labels for VITA–AGRA include a statement that the product is not a Pfizer product.

The exception proves the rule here. The HERBSCRIPTIONS ® line includes ZONK OUT, which obviously does not include the "HERB-" prefix or any other part of a word suggesting an association with a famous brand name drug or family of drugs. Feinstein testified that ZONK OUT is intended to promote deep sleep. He admitted that he used that name because "I did not believe that there was a sleeping preparation out there that was so widely known with a suffix that would call to mind a certain function so as to help the consumer know that melatonin combined with passion flower and calcium magnesium would help them sleep." Tr. 52. His testimony continued:

Q So you couldn't—for your product for deep sleep, you couldn't find a product with a brand name sufficiently well known that called to mind that function of promoting deep sleep to fit with this particular product, is that correct?

A I don't know if I'd agree with what the—say that again, please.

(Whereupon the pending question was read back.)

A That's correct.

Tr. 52–53.

As compared to Lilly, which is a worldwide pharmaceutical company established in 1876, with annual sales in the billions of dollars, Natural Answers launched its business in 1999 and has one full-time employee, founder Brian Feinstein. Natural Answers' sales of HERBROZAC have amounted to no more than $2000 to date.

Feinstein and Natural Answers have filed applications to register trademarks for HERBSCRIPTIONS ® and the various Natural Answers products, including HERBROZAC. Feinstein submitted his application to register HERBROZAC in September 1998. On January 5, 1999, a lawyer for Lilly sent a letter to Feinstein asking him to withdraw the trademark application. Pl.Ex. 5–1. Feinstein did not respond. The proposed HERBROZAC mark was first published for opposition in August 1999. Lilly has filed a notice of opposition to Feinstein's application. Pl. Ex. 5–3. No final action has been taken on the application.

Among Natural Answers' other trademarks, its applications to register HERBOCET ®, HERBSCRIPTIONS ®, HERBASPRIN ®, and HERBADRYL ® have been allowed. Its application for HerbenolPM has been published for opposition and the seller of TylenolPM ® has filed a notice of opposition. Natural Answers' application for VITA–AGRA has been published for opposition.

On the web page for HERBROZAC, Natural Answers included several references to PROZAC ® in the source file until December 1999. These references were not visible to a casual visitor to the web page, but they were visible to a visitor who sought to access it. (The source file for a web page is available on most computer terminals by highlighting the "view" command and then clicking on "source" or "page source." See Def. Ex. 106.) These so-called "metatags" naming PROZAC ® in the source file were read by search engines searching Internet sites. The effect of the PROZAC ® metatags was to make the HERBROZAC web page responsive to Internet users' searches for sites relating to PROZAC ®.

The PROZAC ® metatags apparently did little to raise the visibility of the HERBROZAC web page. Tests on various search engines before the metatags were removed indicated that the HERBROZAC web page was swamped by many other web pages with far more references to PROZAC ®. See Def. Ex. 101. Natural Answers removed the PROZAC ® metatags from the source files of its web site in December 1999 after Lilly raised in this lawsuit a specific objection to their use.

### III. Herbal Diet Supplements and Pharmaceutical Companies

The legal line between pharmaceutical drugs and herbal remedies has begun to blur in the market place. Several major pharmaceutical companies have recently

begun marketing herbal products based, as HERBROZAC is, on St. John's Wort. These companies include Warner–Lambert and SmithKline Beecham. See Pl. Exs. 2–5, 2–6, 2–7.

This phenomenon lends weight to a possibility that is legally important. It would not be unreasonable for a number of consumers who see or hear the name HERBROZAC not only to associate the name with PROZAC ® but also to assume or expect that there is some affiliation between the two. Even though the two products are distributed differently and are subject to very different regulatory regimes, they obviously are marketed to address similar if not identical conditions. The fact that some other major pharmaceutical companies are now marketing herbal products in general, and especially herbal products for mood elevation tends to lend some support to the possibility of confusion with respect to association or affiliation.

### Conclusions of Law

#### I. Standard for Preliminary Injunction

In a recent Lanham Act case the Seventh Circuit set forth its definitive standard for deciding motions for preliminary injunctions:

> As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to nonparties.
>
> The court, sitting as would a chancellor in equity, then "weighs" all four factors in deciding whether to grant the injunction, seeking at all times to "minimize the costs of being mistaken." We call this process the "sliding scale" approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.

*Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992) (vacating denial of preliminary injunction where Abbott showed likelihood of succeeding on merits and court should have presumed irreparable harm from deceptive comparative advertising) (citations omitted).

#### II. Likelihood of Success on the Merits

##### A. Trademark Infringement

To succeed on a trademark infringement claim, a plaintiff must establish that it has a protectable trademark and that the alleged infringer's use of that trademark is likely to cause confusion among consumers. *Munters Corp. v. Matsui America, Inc.*, 909 F.2d 250, 252 (7th Cir.1990); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988). Lilly's PROZAC ® mark was registered more than five years ago and has been in continuous use for more than five years, so the mark is "incontestable." 15 U.S.C. § 1065. Since Lilly's PROZAC ® mark is incontestable, Natural Answers cannot argue that the PROZAC ® mark is invalid or unprotectable. See *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 205, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). However, Lilly must still prove infringement (by showing "likelihood of confusion"), and its claims for infringement are subject to defenses set forth in 15 U.S.C. § 1115(b).

In assessing the likelihood of confusion, the court must consider several factors: (1) the degree of similarity between the parties' marks in appearance and sug-

gestion (or actual copying); (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of complainant's mark; (6) actual confusion; and (7) intent to palm off by the infringer. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club, LP*, 31 U.S.P.Q.2d 1801, 1806 (S.D.Ind.1994), *aff'd*, 34 F.3d 410 (7th Cir. 1994).

This list of factors is not intended to be a mechanical checklist. No one factor is decisive, and the court must weigh all the facts and circumstances of the particular marks, products, and parties. See *International Kennel Club*, 846 F.2d at 1087. There are a myriad of variables to be considered, but the most important are the similarity of the marks, the intent of the claimed infringer, and evidence of actual confusion. *G. Heileman Brewing Company, Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 999 (7th Cir.1989). In general, the Seventh Circuit has often reaffirmed that the weight accorded to each of the seven factors will vary from case to case. *E.g., Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir.1996).

### 1. Similarity of Marks

There is a strong similarity between the marks PROZAC ® and HERBROZAC, in terms of sight, sound, and meaning. HERBROZAC includes five of the six letters of PROZAC ®. As for the sixth, the "B" sound in HERBROZAC is very similar to the "P" sound at the beginning of PROZAC ®. The net effect is a message that effectively states "herbal Prozac."

In their surreply brief, defendants argue that HERBROZAC merely "calls to mind" the PROZAC ® mark. The Lanham Act does not prohibit the use of a mark that merely calls to mind another mark. See 3 McCarthy on Trademarks and Unfair Competition § 23:9 (4th ed.1999). If Lilly's case were based *only* on the similarity of the two marks, defen-

dants' point would carry more weight. In considering the likelihood of confusion, however, the court must consider several other factors which show that HERBROZAC does much more than merely "call to mind" the PROZAC ® mark.

### 2. Similarity of Products

There are important differences and similarities between these two products. HERBROZAC is not a drug. It is a dietary supplement available directly to consumers who choose to take it. The maker of HERBROZAC may not lawfully claim that the product is intended to diagnose, treat, or cure a disease. By contrast, PROZAC ® is a prescription drug that has been proven safe and effective in treating clinical depression and other conditions. There are also physical differences between the products that should not be overlooked. HERBROZAC comes in large capsules with a distinctly herbal odor. PROZAC ® comes in small green and off-white pills.

Despite these differences, the difference between a drug and a dietary supplement is primarily an artificial construct of the law, not necessarily a real difference between products. The artificial distinction between drug and dietary supplement is one that Natural Answers seeks to preserve for legal purposes but to obscure for marketing purposes. Natural Answers markets HERBROZAC as an alternative to PROZAC ® and other antidepressant drugs. And the promotion of "mood elevation" (which HERBROZAC claims) is neatly and intentionally parallel to the use of PROZAC ® to treat depression.

Competition between products is a matter of degree. COCA-COLA ® competes most directly with PEPSI-COLA ® and other cola drinks, but it also competes to some degree with other beverages, such as ginger ale, root beer, fruit juices, milk, and bottled water. Similarly, PROZAC ® competes most directly with other prescription antidepressant drugs like Zoloft ® and Elavil ®. Where the defendant has

chosen to market its product explicitly as an alternative to the plaintiff's product, however, as in this case, it is reasonable to treat the products as in direct competition or at the very least as in close "competitive proximity," despite some important differences. See *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 257–58 (2d Cir.1987) (Mobil's famous flying horse mark with word "pegasus" was infringed by oil trading company's use of "pegasus;" although Mobil did not use flying horse mark in oil trading business, the competitive proximity of the businesses and the strength of Mobil's mark tended to show likelihood of confusion).

The Seventh Circuit has explained, in applying this factor, that the parties' lines of business need not be the same, so long as their "'products [or services] are the kind the public attributes to a single source.'" *Forum Corporation of North America v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir.1990), quoting *International Kennel Club*, 846 F.2d at 1089, and citing *Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1331 (7th Cir.1977). "The parties need not be in direct competition and their goods and services need not be identical." *Forum*, 903 F.2d at 442, citing *Halliburton Co. v. Halliburton Pipe and Steel Co.*, 207 U.S.P.Q. 318, 320 (S.D.Tex.1980) (concurrent use between large diversified oil field service company and distributor of steel supplies to petroleum companies).

The distinction between drugs and dietary supplements is recognized in the law, but it is being obscured in the marketplace. As noted above, large pharmaceutical companies are now marketing their own brands of dietary supplements. These include products based on St. John's Wort, which is associated with some degree of "mood elevation." In other words, a dietary supplement based on herbs lies, for purposes of trademark law, in the natural line of expansion for a manufacturer of pharmaceutical drugs, especially where a drug and dietary supplement are intended and used to affect the same body functions and/or structures. That is, Natural An-

swers is trying to position its HERBRO-ZAC in the closest "competitive proximity" to PROZAC ® that the food and drug laws will possibly allow. In addition, because of this competitive proximity, a consumer could now reasonably perceive some affiliation or association between the sources of PROZAC ® and HERBROZAC.

### 3. *Area and Manner of Concurrent Use*

With respect to this factor, again, there are both similarities and differences. Lilly distributes PROZAC ® throughout the United States and in many countries around the world. PROZAC ® is available both from brick-and-mortar pharmacies and from Internet pharmacies (as long as the customer can show he or she has a proper prescription). Natural Answers advertises HERBROZAC on the Internet and appears to be willing to fill orders at least from anywhere in the United States. The important difference is that PROZAC ® is available only by prescription, while anyone may order HERBROZAC over the Internet.

### 4. *Consumers' Degree of Care*

Lilly does not contend that consumers are likely to believe that HERBROZAC capsules are really PROZAC ®. Such confusion is not likely because one cannot even purchase PROZAC ® without a prescription from a licensed physician, who is not at all likely to confuse one product for another. Lilly contends, however, that the similarity of the trademarks is likely to confuse some consumers as to whether there is some affiliation or association between the sources of the two products. The Lanham Act applies to use of a product name that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ." 15 U.S.C. § 1125(a)(1); see also 4 McCarthy, § 24:16

at 24–33 ("If the consumer is reasonably mistaken as to the source or sponsorship of an alleged infringer's goods, she suffers a real and independent injury . . . ."); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir.1998) (golf course designed to imitate famous golf holes found likely to cause confusion of affiliation between the original golf courses and imitation course).

On the issue of consumer care with respect to affiliation or association, there is no reason to expect consumers of HERBROZAC to exercise great care to determine whether or not the seller of HERBROZAC is affiliated, connected, or associated with the seller of PROZAC ®.

### 5. *Strength of the PROZAC ® mark*

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir.1992), quoting *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979), superseded by rule on other grounds, as recognized in *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.1992).

The PROZAC ® mark is unusually strong. First, it is a fanciful word that carries no meaning apart from its use to identify a product. It does not describe or suggest the function of the product it names. When the seller of a product coins a word just for the product, as Lilly did with PROZAC, trademark protection is at its highest. See *Polaroid Corp. v. Polaraid, Inc.*, 319 F.2d 830, 837 (7th Cir.1963); accord, *Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.1984).

■ Natural Answers asserts that PROZAC ® is now so famous that it has become a "generic" term no longer entitled to trademark protection. Def. Br. at 14. A trademark becomes generic when it comes to describe, in common usage in the United States, a class of goods rather than an individual product. See *New Kids on the Block v. New America Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir.1992). The Seventh Circuit has explained:

When a trademark becomes generic, such as "aspirin" or "thermos," and so loses trademark protection, because the public, perhaps egged on by the omnipresent media, decides to use the trademark to designate not the particular manufacturer's brand but the entire product comprising all the competing brands, the trademark is dead no matter how vigorously the holder has tried to prevent this usage.

*Illinois High School Ass'n v. GTE Vantage, Inc.*, 99 F.3d 244, 247 (7th Cir.1996) (collecting cases and affirming finding that "March Madness" phrase was generic).

■ Where the plaintiff's trademark has been registered with the United States Patent and Trademark Office, the plaintiff is entitled to a presumption that the mark is not generic, and the burden of proof is on the defendant to come forward with evidence showing that the mark is generic. *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir.1986); accord, *Reese Publishing Co. v. Hampton Int'l Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980), citing *McGregor–Doniger Inc. v. Drizzle, Inc.*, 599 F.2d at 1132; *Venetianaire Corp. of America v. A & P Import Co.*, 429 F.2d 1079, 1080 n. 1 (2d Cir.1970); *E.I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F.Supp. 502, 523 n. 45 (E.D.N.Y.1975).

For an illustration of the type of proof useful in showing that a trademark has become descriptive and generic, the district court's opinion in the "thermos" case is instructive. See *American Thermos Products Co. v. Aladdin Industries, Inc.*, 207 F.Supp. 9 (D.Conn.1962), *aff'd sub nom. King–Seeley Thermos Co. v. Aladdin Industries, Inc.*, 321 F.2d 577 (2d Cir. 1963). The evidence in the thermos case included hundreds of newspaper and magazine articles, as well as dictionary and encyclopedia references, large volumes of

correspondence, and a public survey. *American Thermos,* 207 F.Supp. at 19–20. The district court found that the large volume of references using the term "thermos" in a generic or descriptive sense showed that the term had lost its trademark status as identifying the source of a particular brand of vacuum-insulated containers. The Second Circuit affirmed on the district court's detailed findings. *King–Seeley Thermos Co.,* 321 F.2d at 579.

Professor McCarthy has catalogued types of evidence useful in proving that a term has become generic. Such evidence may include generic use of the mark by competitors without objection from the plaintiff, the plaintiff's own use in a generic way, dictionary definitions, generic use in the media, testimony of persons in the trade about the use of the term, and consumer surveys. See 2 McCarthy, § 12:13 at 12–28 to –31.

Natural Answers has tried to use Lilly's own evidence of the fame of PROZAC ® to show that the term has become generic. Natural Answers highlights, for example, the *Newsweek* statement that "Prozac has the familiarity of Kleenex and the social status of spring water." See, *e.g.,* Pl.Ex. 1–3 at 1. In fact, however, the cluster of *Newsweek* articles did not use the term generically but distinguished between PROZAC ® and other antidepressant drugs. A trademark can become exceptionally strong and famous without becoming generic, as suggested by the examples of COCA–COLA ® and KODAK ®.

Natural Answers has not shown that PROZAC ® is likely to be deemed generic. There is no evidence that any other competitors have used the term in a generic

way, let alone that Lilly has tolerated such use.[4] There is no evidence that Lilly itself has used the term in a generic way. The parties have not submitted dictionary definitions tending to show the term has seeped into common usage in a generic sense. See *Illinois High School Ass'n,* 99 F.3d at 246 (trademark holder must try to convince "dictionary editors, magazine and newspaper editors, journalists and columnists, judges, and other lexicographically influential persons" to avoid using the trademark in a generic way).

The media references actually before the court do not use the term "Prozac" in a generic way. They use the term instead to identify plaintiff Lilly's product. They tend to focus on PROZAC ® more than other brands, but they do not use the term "Prozac" to refer to a whole class of different antidepressant drugs. In fact, the references to the new class of antidepressant drugs, of which PROZAC ® is the most widely sold, are much more descriptive: "selective seritonin re-uptake inhibitors." Nor is there any evidence of persons in the trade that the term "Prozac" has taken on a generic meaning, nor has Natural Answers presented any public surveys about the meaning of the term. The court recognizes, of course, that the case is now pending on a motion for preliminary injunction and that defendant may not have had a full opportunity to seek out such evidence. But defendant has not come forward with any serious indication that evidence of generic use of the term "Prozac" is likely to be available.

### 6. *Evidence of Actual Confusion*

 Lilly has not presented any evidence of actual confusion here. That is

---

**4.** Like many defendants in trademark cases, Natural Answers has tried to portray itself as a tiny David being bullied by a gigantic Goliath. For the holder of a famous trademark on a successful product, however, there is little alternative because the risk of inaction is so great. Delay or failure in enforcing trademark rights will usually give rise to a laches defense. Thus, even when the infringing use is on a new product produced in small volume by a tiny start-up company, the holder of

the trademark and the court must assume that the defendant's new product will achieve great commercial success. If the holder of the famous trademark waits, a growing competitor may argue laches. If the holder ignores the first infringer, a later infringer with a more successful product may try to use the holder's failure to contest the small infringing use as evidence of abandonment or of generic meaning.

not surprising. Lilly filed suit and sought a preliminary injunction before HERBRO-ZAC had reached a level of even $2000 in total sales. In fact, a respectable consumer survey would probably require sampling reactions of more consumers than have actually purchased HERBROZAC to date. The Seventh Circuit has made it clear that proof of actual confusion is not essential for a plaintiff to prevail where the other factors point to a significant likelihood of actual confusion. *E.g., Computer Care v. Service Systems Enterprises, Inc.*, 982 F.2d 1063, 1070 (7th Cir.1992).

Natural Answers is probably correct in its contention that, by the time a consumer actually completes a purchase and receives a bottle of HERBROZAC capsules, the consumer is unlikely to believe that she has purchased PROZAC ® manufactured by Lilly. That point overlooks another important kind of confusion under the Lanham Act, which has been described as "initial interest confusion," which occurs when a competitor lures potential customers by initially passing off its goods as those of another, even if confusion as to the source of goods is dispelled by the time the sales are completed. See *Dorr–Oliver, Inc.*, 94 F.3d at 382, citing *Forum Corp.*, 903 F.2d at 442 n. 2, and *Mobil Oil Corp.*, 818 F.2d at 260.

In this case there is significant evidence of a risk of such "initial interest confusion" as a result of Natural Answers' use of both the HERBROZAC mark and the term "Prozac" as a "metatag" on its web site. Natural Answers chose the name HERB-ROZAC precisely because it suggested a similarity to PROZAC ®. And Natural Answers chose to use the "Prozac" meta-tags in an attempt to attract the attention of Internet surfers looking for information about PROZAC ®.

### 7. Defendant's Intent

Where the defendant has deliberately tried to create confusion between its product and the plaintiff's by copying a trademark, the defendant's intent is an "important factor bearing on the likelihood of confusion." *Computer Care*, 982 F.2d at 1070, quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 857 (7th Cir.1982). While a defendant's intent to copy the plaintiff's trademark does not create a presumption of confusion, a defendant's intent can weigh more heavily than other factors in certain cases. See *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1184–85 (7th Cir.1989). In this case, Natural Answers' intent to copy Lilly's trademark is clear and is an important factor in considering the risk of confusion by consumers in the source of Natural Answers' product.

As discussed above, Natural Answers coined the name HERBROZAC precisely because it would remind consumers of PROZAC ®. Similarly, Natural Answers included in the source files of its web page the term "Prozac" for the clear purpose of attracting attention to its web site when Internet users searched for information about PROZAC ®. The fact that defendant's efforts along these lines have not been successful to date does not undermine the relevance of those efforts as evidence of intent to confuse and mislead.

Natural Answers has suggested that this case raises profound and novel issues about the use of trademarks in metatags.[5] The court disagrees. The Ninth Circuit recently surveyed the early reported deci-

---

**5.** The Ninth Circuit explained metatags in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1045 (9th Cir.1999):

Metatags are HTML code intended to describe the contents of the web site. There are different types of metatags, but those of principal concern to us are the "description" and "keyword" metatags. The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site. The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher on the list of "hits" the web page will appear.

sions dealing with use of trademarks in metatags in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036 (9th Cir.1999). The case involved the use of a competitor's trademark as a metatag to divert interest from that competitor's web site. The Ninth Circuit reversed the district court's denial of injunctive relief and explained how such use of a metatag could violate the Lanham Act:

> Using another's trademark in one's metatags is much like posting a sign with another's trademark in front of one's store. Suppose West Coast's competitor (let's call it "Blockbuster") puts up a billboard on a highway reading—"West Coast Video: 2 miles ahead at Exit 7"where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. Nevertheless, the fact that there is only initial consumer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill.

*Brookfield Communications,* 174 F.3d at 1064.

The Ninth Circuit further explained that its holding would not prohibit use of another's trademark on a web site or in metatags where the use would be a "fair use" under the Lanham Act, such as in nondeceptive comparative advertising or in a fair description of the site. *Id.* at 1065–66. In the case of metatags, however, where the person viewing a web site may not even see the metatags, it is difficult to see

how the use could be fair, except in some unusual situations. See *New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.,* 79 F.Supp.2d 331, 339–341 (S.D.N.Y.1999) (use of plaintiff's trademark and domain name in metatags amounted to false designation of origin under Lanham Act; attorneys' fees awarded to plaintiff); *SNA, Inc. v. Array,* 51 F.Supp.2d 554, 562 (E.D.Pa.1999) (defendant's deliberate use of plaintiff's website address as a metatag in defendant's web page violated Lanham Act); cf. *Playboy Enterprises, Inc. v. Welles,* 7 F.Supp.2d 1098 (S.D.Cal.1998) (former Playboy Playmate could use "playboy" and "playmate" both in metatags and in references on her web site where the terms fairly and accurately described the contents of the site, and where the site included explicit disclaimers of any current affiliation with plaintiff).

■ Returning to the overall question of likelihood of confusion, the seven factors in the canonical Seventh Circuit formula are not intended to be a mechanical checklist. The overall question remains the likelihood of confusion on the part of consumers, and in this case the relevant type of confusion includes "initial interest confusion" and confusion as to affiliation or association. Considering all the factors as set forth above, the court concludes that Lilly has shown an unusually strong case on the issue of likelihood of confusion. Most important here are the unusual strength of Lilly's PROZAC ® mark, the strong similarity between PROZAC ® and HERBROZAC, and defendant's intentional selection of the HERBROZAC name precisely because of its similarity to PROZAC ® for the purpose of suggesting an association or affiliation between the products. Add to this mixture the fairly close "competitive proximity" of the two products, especially as pharmaceutical companies expand into the herbal and dietary supplement business, and Lilly has made a powerful showing of likelihood of success on its claim for trademark infringement.

B. *Dilution of Famous Trademark*

Lilly also seeks relief under the Federal Trademark Dilution Act of 1995, which added § 43(c) to the Lanham Act, 15 U.S.C. § 1125(c). Section 43(c)(1) provides:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. The prohibition on dilution is intended to "protect the trademark owner from the erosion of the distinctiveness and prestige of a trademark caused by the sale of other goods or services under the same name . . ., even though there is no confusion as to source." *Illinois High School Ass'n,* 99 F.3d at 247.

■ Lilly must prove four elements to establish a federal trademark dilution claim: (1) its PROZAC ® mark is famous; (2) Natural Answers adopted its mark after Lilly's mark became famous; (3) Natural Answers diluted Lilly's mark; and (4) Natural Answers' use of its mark is commercial and in commerce. See 15 U.S.C.

§ 1125(c)(1); *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 639 (7th Cir.1999). These elements are not fundamentally different from those found in most state antidilution statutes. See, *e.g., Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2d Cir.1996) (under New York's antidilution statute, the prior user must show both that its mark is distinctive and that there is a "likelihood of dilution"); *Hyatt Corp. v. Hyatt Legal Servs.,* 736 F.2d 1153, 1157 (7th Cir.1984) (under Illinois Anti–Dilution Act, prior user must "show that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness; neither competition between the users nor confusion need be shown") (footnote omitted).[6]

Plaintiff Lilly has shown that it is likely to prevail on this claim by establishing each of the four elements of the federal dilution claim. The second and fourth elements are not in dispute. If Lilly's PROZAC ® mark is famous, Natural Answers plainly adopted its HERBROZAC mark after PROZAC ® became famous, and Natural Answers uses its HERBROZAC mark in commerce and for commercial purposes. Natural Answers contends, however, that PROZAC ® is not famous and that the HERBROZAC mark causes no dilution of the PROZAC ® mark.

1. *PROZAC ® is a "Famous" Mark*

■ Section 43(c)(1) of the Lanham Act provides a non-exclusive list of eight factors relevant to whether a mark is distinctive and famous:

"plain language" of New Mexico's statute, which allows relief "notwithstanding the absence of competition between the parties," applied to competing uses). Congress addressed this issue explicitly when it enacted the federal Dilution Act. The federal act defines dilution as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, *regardless of the presence or absence of . . . competition* between the owner of the famous mark and other parties. . . ." 15 U.S.C. § 1127.

---

6. Several courts have limited state antidilution statutes to cases involving non-competing products. See *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 619 (7th Cir. 1993) ("the protection of the Illinois Anti–Dilution statute is not available to competitors under Illinois case law"); *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 380 (7th Cir.1984) (same); see generally *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1489 (10th Cir.1987) (collecting cases limiting state antidilution statutes to noncompeting products, but holding that the

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered.

15 U.S.C. § 1125(c)(1). The court considers these factors in turn, but will try to avoid undue repetition where they duplicate the analysis of factors for likelihood of confusion in trademark infringement. The bottom line here is that PROZAC ® is the archetype of a "famous" mark for these purposes.

(A) *Distinctiveness of the PROZAC ® Mark*

In considering whether a mark is "famous," the court must first determine whether the mark is "distinct." It is possible for a mark to be famous but not distinct. Examples of famous but non-distinct marks are "American," "First," "Federal," or "National." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 216 (2d Cir.1999). As the court found in *Nabisco*, the "most distinctive are marks that are entirely the product of the imagination .... The strongest protection of the trademark laws is reserved for these most highly distinctive marks." *Id.* PROZAC ® is a fanciful word that carries no meaning apart from its use to identify Lilly's product. It does not describe or suggest the function of the product it names. This

fact weighs heavily in favor of finding that the PROZAC ® mark is distinct.

Natural Answers disputes the distinctiveness of the PROZAC ® mark by breaking down the word PROZAC ® into two syllables. Natural Answer argues that PROZAC ® is not a distinctive mark because the syllables "pro" and "zac" have been used in a number of other product names, including other Lilly products. See Def. Br. at 19–21.

By breaking down the PROZAC ® mark into two syllables, however, Natural Answers' argument does not accurately reflect the letters that are shared by both marks. HERBROZAC and PROZAC ® do not share only the three letter syllable "zac." Five of the six letters in the PROZAC ® mark are contained in the HERBROZAC mark. Natural Answers merely dropped the "P" from PROZAC ® and substituted the word "HERB."

Putting that fact aside, however, the primary problem with Natural Answers' argument is that the distinctiveness of the two separate syllables in the PROZAC ® mark is not the issue here. The question is whether the PROZAC ® mark as a whole is distinctive. Natural Answers has not pointed to any court decisions analyzing a mark's distinctiveness by breaking it down in the manner Natural Answers suggests. The PROZAC ® mark as a whole is an arbitrary and fanciful name that does not describe the function of the product it names, and is thus a highly distinctive mark. This distinctiveness weighs in favor of finding PROZAC ® to be a famous mark.

Natural Answers also argues that the trademark PROZAC ® has become generic and is thus not a distinct name. A trademark becomes "generic" when it describes a class or a group of products rather than an individual product. See *Illinois High School Ass'n*, 99 F.3d at 247. As discussed above, however, there is no evidence that PROZAC ® has become a victim of "genericide." The media references before the court do not use the

PROZAC ® mark in a generic way. They use the term only to identify Lilly's product.

### (B) Duration and Extent of Use of the PROZAC® Mark in Connection with Fluoxetine Hydrochloride

Lilly has used the PROZAC ® mark since 1988 to market fluoxetine hydrochloride. The name is a fanciful one created by Lilly for the purpose of marketing this drug. There is no evidence before the court that Lilly has itself used or permitted the use of the PROZAC ® mark on any product other than fluoxetine hydrochloride.

### (C) Duration and Extent of the Advertising and Publicity of the PROZAC ® Mark

This factor considers how long a mark has been in use and how much advertising and publicity the mark has garnered during its life. Natural Answers argues that the eleven years the PROZAC ® mark has been in use is too short a time to establish "fame" for purposes of the Dilution Act. Natural Answers points to two decisions in which courts held that product names with longer life spans were not "famous" for dilution purposes. See S Industries, Inc. v. Diamond Multimedia Systems, Inc., 991 F.Supp. 1012, 1022 (N.D.Ill.1998) (mark in use for 17 years held not famous); Michael Caruso & Co., Inc. v. Estefan Enterprises, Inc., 994 F.Supp. 1454, 1463 (S.D.Fla.1998) (mark in use for 15 years held not famous).

There is no arbitrary minimum time, however, for proving fame for these purposes, nor did the courts in those cases suggest that there is. Consider, for example, the extraordinary speed with which some commercial names associated with the Internet have become famous in the last few years. The duration of the use of the PROZAC ® mark is only part of the analysis. The court must also consider the extent of the advertising and publicity the mark received during its life. In S Industries, the plaintiff "presented no evidence of any substantial publicity or ad-

vertising, other than two catalogs, a few advertising contracts with retailers, and three solicitation letters ...." S Industries, 991 F.Supp. at 1022. In Caruso, the court found that the plaintiff's publicity and advertising extended only to the junior women's apparel market and was not a "generally famous mark like 'Exxon' and 'Kodak.'" Caruso, 994 F.Supp. at 1463. In contrast here, the massive publicity surrounding the PROZAC ® mark and product during the last eleven years has been more than sufficient to make it a "famous" mark despite its relatively short life.

### (D) The Geographical Extent of the Trading Area in which the PROZAC ® Mark is Used

There is little dispute over this factor. PROZAC ® has been marketed and sold throughout the United States and around the world. Since 1988, in the United States alone, PROZAC ® has been prescribed over 240 million times to more than 17 million Americans. PROZAC ®'s sales have totaled more than $12 billion since 1988. The PROZAC ® mark is used in an extremely broad trading area.

### (E) The Channels of Trade for the PROZAC ® Product

PROZAC ® is a prescription drug, and as such, its channels of trade include doctors, pharmacists, and patients who have received prescriptions for PROZAC ®.

### (F) The Degree of Recognition of the PROZAC® mark in the Trading Areas and Channels of Trade used by both Lilly and Natural Answers.

This factor considers the degree of recognition that the PROZAC ® mark has achieved in markets that are used by both Lilly for PROZAC ® and Natural Answers for HERBROZAC. Essentially, the question is whether potential customers for HERBROZAC recognize the PROZAC ® mark. If they did not, then Natural Answers might be able to argue that the

PROZAC ® mark had achieved fame only in a particular "niche" market and not a more general level of fame. See *Syndicate Sales*, 192 F.3d at 640 (collecting cases on fame in niche markets); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F.Supp. 568, 578 (D.Col.1997), *aff'd*, 185 F.3d 1084 (10th Cir.1999); *Golden Bear International, Inc. v. Bear U.S.A., Inc.*, 969 F.Supp. 742, 749 (N.D.Ga.1996).

A good example of the application of this factor is *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1031 (2d Cir.1989). In *Mead Data*, the Second Circuit applied New York's antidilution statute and concluded that LEXIS, the mark used by the plaintiff for its computerized legal research service, is famous and distinctive only in its market—attorneys and accountants. *Id.* The "general public associates nothing with LEXIS." *Id.* Therefore, it could not enjoin the defendant's use of LEXUS as the mark for luxury automobiles and the division of Toyota that manufactures them: the market in which LEXIS is well-known is considerably smaller than the market in which LEXUS operates.

PROZAC ®'s channels of trade are among doctors, pharmacists, and patients with a PROZAC ® prescription. Because of these limited channels of trade, Natural Answers argues, this factor weighs against a finding that the PROZAC ® mark has achieved the "general" level of fame that is required under the Dilution Act. But see *Syndicate Sales*, 192 F.3d at 640 (fame of plaintiff's mark in "niche" market may support federal dilution claim where defendant seeks to use similar mark in same niche). The court disagrees with defendant's contention. As set forth above, the PROZAC ® mark is widely publicized and advertised around the United States and the world. This publicity is not limited, as some drugs are, to medical journals and catalogs. The PROZAC ® mark has achieved recognition among an extraordinarily wide public.

PROZAC ®'s wide public recognition obviously includes a large percentage of Natural Answer's actual and potential customers. In fact, this overlap in the recognition of the PROZAC ® mark between Lilly's and Natural Answer's markets is precisely why Natural Answers chose the name HERBROZAC. Natural Answers wants people to consider using its product as a "natural" alternative to PROZAC ®. The overlap of markets is further evidenced by the fact that Natural Answers has used the word "Prozac" as a metatag for its web page. Natural Answers wanted people who were using the web to gather information on PROZAC ® to come across its web page so that Natural Answers could encourage them to consider an all-natural alternative to PROZAC ®. Natural Answers' entire marketing strategy for HERBROZAC has been based on the fact that its potential customers recognize the PROZAC ® mark. This factor clearly weighs in favor of PROZAC ® being a famous mark.

(G) *The Nature and Extent of the Use of the Same or Similar Marks by Third Parties*

The court addressed this factor above in its discussion of whether the PROZAC ® mark is distinctive. Natural Answers points out that a number of product names use the prefix "pro" and the suffix "zac." Again, however, the entire mark should be considered in determining the fame of a mark. Natural Answers has not put forth any evidence that other products have used, or are using the PROZAC ® mark. Therefore, this factor also weighs in favor of finding the PROZAC ® mark to be famous.

(H) *Registration of the PROZAC ® Mark*

As for the final factor, the PROZAC ® mark has been registered by Lilly. Pl.Ex. 1–1.

The evidence is clear in this case that PROZAC ® is a widely publicized and recognized mark around the world. After considering the factors listed in 15 U.S.C.

§ 1125(c)(1), the court finds that Lilly is likely to be able to show that PROZAC ® is a famous mark for purposes of the Dilution Act.

### 2. HERBROZAC's Dilution of the PROZAC Mark

■ The Lanham Act defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. A likelihood of dilution can be established by showing either "blurring" or "tarnishment." *E.g., Hormel Foods Corp.,* 73 F.3d at 506.

A trademark may be tarnished when it is linked to "products of shoddy quality," is "portrayed in an unwholesome light or unsavory context," or loses its ability to serve as a "wholesome identifier" of a plaintiff's product. *Id.* at 507 quoting *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2d Cir.1994). Lilly does not contend that Natural Answer's HERBROZAC mark tarnishes the PROZAC ® mark. Instead, Lilly asserts that the HERBROZAC mark dilutes its PROZAC ® mark by "blurring" it.

Dilution by blurring occurs where customers or prospective customers see the plaintiff's mark on a "plethora of different goods and services," thus potentially diluting and weakening the mark's ability to serve as a unique identifier of one source—the plaintiff's product. *Id.* at 506; 4 McCarthy, § 24.94. An often-cited hypothetical example of dilution by blurring would be a piano company marketing a "Kodak piano." "No one would confuse Kodak pianos with Kodak film, but the use of the name on the piano could dilute its effectiveness as a mark for the film." *I.P. Lund Trading ApS, Kroin Inc. v. Kohler Co.,* 163 F.3d 27, 49 (1st Cir.1998).

In a concurring opinion in the *Mead Data* decision discussed above, Judge Sweet proposed six factors for considering whether blurring has occurred for purposes of the New York dilution statute. These factors or some combination of them have been applied by a number of courts in analyzing the possible dilution of a mark by blurring. The factors consider: (1) the similarity of the marks, (2) the similarity of the products covered by the marks, (3) the sophistication of consumers, (4) predatory intent, (5) the renown of the senior mark, and (6) the renown of the junior mark. *Mead Data,* 875 F.2d at 1035 (Sweet, J., concurring). Some courts and commentators have questioned the use of some of these factors, however, in analyzing whether a mark has been blurred for purposes of the federal Dilution Act. See 4 McCarthy, § 24:94.1 (questioning the relevance of factors 2, 3, 4, and 6 because they relate to a "likelihood of confusion" analysis rather than a "blurring" analysis.); *I.P. Lund,* 163 F.3d at 49 (agreeing with Professor McCarthy on this point).

This court agrees that several of these factors relate more to a "likelihood of confusion" analysis than a "blurring" analysis. First, the similarity of the products is not necessarily important because the federal Dilution Act was meant to protect non-similar products (*i.e.,* to protect Kodak ® film from Kodak pianos). Next, the sophistication of consumers is also unlikely to be important. A consumer's sophistication is a factor in determining whether the person will be confused between two products or their sources. Both the least and the most sophisticated consumers, however, may find that Kodak's mark has been blurred if they see Kodak pianos for sale. The intent of the junior mark's holder is also unlikely to be important. Using the same example, the manufacturer of Kodak pianos may not intend to use the fame of the Kodak ® film mark to assist it in selling its pianos. Despite this lack of intent, however, the Kodak ® mark may still become blurred and less distinctive because of its use on Kodak pianos. Finally, the renown of the junior mark is also not likely to be controlling here. If a junior mark is well known, then the potential for blurring

it with the senior mark is obvious. Even if the junior mark is not well known, however, a senior mark still becomes diluted under the theory of blurring each time a new junior mark arises. Therefore, the strength of the junior mark should not matter on this issue (although it may be important in choosing an equitable remedy).

 Because dilution by blurring is the gradual whittling away of the value of a famous mark by other similar marks, the key issue in determining whether a junior mark blurs a senior mark is whether permitting junior marks to be used will weaken the strength of the senior mark. *Mead Data*, 875 F.2d at 1031; 4 McCarthy, § 24:94. For blurring to occur, there must be some mental association in the reasonable consumer's mind between the plaintiff's and the defendant's uses of the mark. *Mead Data*, 875 F.2d at 1031. Accordingly, dilution is likely only where the junior mark is either identical or substantially similar to the senior mark. *Id.* at 1029; *Elvis Presley Enterprises, Inc. v. Capece*, 950 F.Supp. 783, 798 (S.D.Tex. 1996) (same under federal Dilution Act). Therefore, the relevant factors are the similarity of the marks and the strength of the senior mark.

The court has already addressed these two factors at length above. There is a strong similarity between these two marks in terms of sight, sound, and meaning. Natural Answers has simply removed PROZAC ®'s first letter and replaced it with "HERB." In addition, the "B" sound is very similar to the "P" sound in PRO-ZAC ®. As the court stated above, the effect of the HERBROZAC name is to portray the image of an "herbal Prozac."

The court has also already addressed the renown of the PROZAC ® mark. PROZAC ® is marketed throughout the United States and the world. It has been featured in numerous national publications and nationally broadcast television shows, and has been the subject of best-selling books. In short, PROZAC ® has become "a designer label, a buzzword, a brand name familiar to not only the 4.5 million Americans who have taken it, but also those who wonder if they, too, might find a cure for whatever ails them in the little green-and-off-white capsule." Pl.Ex. 1–6.

Considering these two relevant factors, Lilly has shown that it is likely to prevail in showing that the HERBROZAC mark blurs the PROZAC ® mark. HERBRO-ZAC is a new product with little national recognition. However, if other manufacturers were to follow Natural Answers' footsteps in naming products, the PRO-ZAC ® mark would become less and less distinctive.

Natural Answers contends, however, that Lilly cannot succeed on its claim under the federal Dilution Act without showing that actual blurring of the PROZAC ® mark has already occurred. See *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 458 (4th Cir.1999) (plaintiff in action under Dilution Act must show "an actual lessening of the senior mark's selling power"). The Fourth Circuit held that the statutory phrase "causes dilution" does not mean "likely" to cause dilution. *Ringling Bros.*, 170 F.3d at 464. More recently, however, the Second Circuit has disagreed in *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 224 (2d Cir.1999). This court agrees with the Second Circuit on this issue. The Fourth Circuit's interpretation of the Dilution Act would effectively defeat the purpose of the Act, and focusing on likelihood of dilution does no violence to the statutory language.

The theory of dilution by blurring is that if a famous commercial mark exists, and other nonfamous similar marks are permitted to be used in commerce, the famous mark will lose more and more of its distinctiveness with each new similar mark. Put another way:

> The theory of dilution by blurring is that if one small user can blur the sharp focus of the famous mark to uniquely signify one source, then another and another small user can and will do so.

Like being stung by a hundred bees, significant injury is caused by the cumulative effect, not by just one.

4 McCarthy, § 24:94 at 24–163. The Dilution Act was written to protect a famous mark from the first "bee sting" and to stop the dilution at the beginning of the problem, not at the end.

If the holder of a senior mark cannot obtain injunctive relief until after actual dilution has occurred, the holder of the senior mark must suffer significant and irreparable harm before it is entitled to relief. In cases like this one, the senior mark holder would probably not be able to establish proof of actual dilution when the first junior mark has just come on the scene. Lilly has filed this case very early, before Natural Answers has sold even $2000 worth of HERBROZAC. By the time a number of junior marks have come into use, the senior mark holder would have a better chance of establishing actual dilution, but if the senior mark holder waits to file any dilution claims until after it can show actual irreparable harm from dilution, the senior mark holder would be open to the argument that it has not actively protected its mark. In addition, in determining whether the senior mark is famous and distinctive, the junior mark holder will have evidence of all the other junior marks to dispute the senior mark's distinctiveness. With every new junior mark, actual dilution increases and the fame and distinctiveness of the senior mark decreases. This sort of double-edged sword is contrary to the purpose behind the Dilution Act. Its purpose was to give the senior mark holder the ability to protect its mark with injunctive relief when the first junior mark arises and before any substantial harm is done.

Thus, Lilly is likely to be able to show: (1) that its PROZAC ® mark is famous, (2) Natural Answers began the use of its HERBROZAC mark after the PROZAC ® mark gained its fame, (3) the HERBROZAC mark dilutes the PROZAC ® mark by blurring it, and (4) that Natural Answers uses its HERBROZAC mark in commerce. Therefore, Lilly has established all four elements of a claim under the Dilution Act and has shown a strong likelihood of success on its dilution claim.

### III. Irreparable Harm

Irreparable harm is generally presumed in cases of trademark infringement. See *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir.1992) (citing the line of cases supporting the "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss."). Irreparable harm is also generally presumed in dilution cases. See *American Dairy Queen Corp. v. New Line Productions, Inc.*, 35 F.Supp.2d 727, 729 (D.Minn. 1998); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 550 (S.D.N.Y. 1996). Although the presumption of harm can be rebutted, it has not been rebutted in this case.

### IV. Balance of Harms

The court must also consider the risk of harm to Natural Answers if the court were to grant a preliminary injunction erroneously. See *Abbott Laboratories*, 971 F.2d at 19. An injunction will leave Natural Answers free to market its blend of St. John's Wort and other herbs, but will prohibit Natural Answers from using a mark deceptively similar to Lilly's PROZAC ®. Requiring that change will impose some costs on Natural Answers and might inflict some competitive harm. In view of the evidence that Natural Answers has sold only a very small amount of its product using the HERBROZAC name, however, the extent of the harm appears not to be great.

### V. The Public Interest

In considering the public interest, the court focuses generally on the interests of any persons not present before the court as parties. *Abbott Laboratories*, 971 F.2d at 18–19. The public interest generally favors enforcement of trademark laws so as to prevent confusion on the part of

consumers. See *id.* at 19, *International Kennel Club,* 846 F.2d at 1092 n. 8; *Philip Morris Inc. v. Allen Distributors, Inc.,* 48 F.Supp.2d 844, 855 (S.D.Ind.1999). There is certainly no evidence that a preliminary injunction will cause harm to anyone who is not a party to the lawsuit.

## VI. *The Scope of Relief and Requirements for Security*

Preliminary injunctive relief must be tailored to the harm that is threatened. In this case the threat obviously comes from defendant's use of the name HERBROZAC and from its use of the term "Prozac" and similar terms as metatags in the source file for its web site. The court will therefore order defendant to remove the name HERBROZAC from its web site and any other advertising effective immediately. The court will also order defendant to remove references to PROZAC ® (including variations such as "prozack" and "prozac") from the source files of its web site effective immediately. The court will also order defendant to report to the court no later than January 31, 2000, confirming that defendant has complied with these requirements. The court will not prohibit defendant from filling orders actually received before January 31, 2000, with bottles labeled HERBROZAC, but any orders received after that time may not be filled unless the bottles are relabeled without the HERBROZAC name.

Defendant is entitled to security against the risk that the injunction is erroneous. In light of the very low level of HERBROZAC sales and the modest costs needed to comply with the injunction, the court will order plaintiff Lilly to post security in the amount of $10,000 no later than January 27, 2000.

A preliminary injunction to this effect shall issue immediately by separate order.